FILED
IN OPEN COURT

SEP 2 2022

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

UNITED STATES OF AMERICA

v.   Case No. 4:22-cr-17

ROBIN HOOPER,

Defendant.

## STATEMENT OF FACTS

The United States and the defendant, Robin Hooper, also known as Robin Rennockl and Robin Eley, (hereinafter, "the defendant"), agree that, if this matter had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. At all times relevant to the indictment, the defendant resided in the Eastern District of Virginia in Mathews, Virginia, with W.H., her purported husband. They held themselves out as being married on or about August 26, 2017, and often referred to the defendant as "Robin Hooper" thereafter, but she filed her tax returns as a single individual named either "Robin E. Rennockl" (Tax Years[1] 2015–2016) or "Robin E. Eley" (Tax Years 2017–2019).

2. At least in or about 2017, despite having limited experience in the seafood business, W.H. decided to start an oyster farming operation ("WWOC") with the defendant from the waterfront property where they resided in Mathews, Virginia.

3. Initially formed as Mobjack Bay Oyster Company LLC in November 2017, WWOC became Williams Wharf Oyster Company LLC in or about March 2018. In or about

---

[1] This denotes the calendar year for which taxes are due, so "Tax Year 2015" is January 1–December 31, 2015.



December 2019, the defendant organized the stock corporation "Sea Orchard Farms Inc." – in part to try to rebrand WWOC following W.H's November 2019 arrest on child sexual abuse charges – and tried to negotiate with WWOC investors to consolidate WWOC operations under that entity.

4. At all times relevant to the Information, the defendant was WWOC's sole named owner and member. W.H. had a 2014 felony conviction for accepting a kickback in violation of 41 U.S.C. §§ 8702 and 8707, and was still subject to outstanding restitution and fines, some of which were paid from the WWOC operating account.

5. At all times relevant to the Information, the Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

6. Pursuant to the Internal Revenue Code and associated statutes and regulations, the defendant was required to withhold certain amounts from WWOC employees' gross pay – including Federal Insurance Contribution Act ("FICA") taxes, which represent Social Security and Medicare taxes, and federal income taxes – referred to collectively as "trust fund taxes." The defendant was also required to make WWOC contributions under FICA for Social Security and Medicare in amounts matching that withheld from WWOC's employees' pay for those purposes.

7. The defendant was required to remit both the withheld trust fund taxes and the matching employer contributions – collectively referred to as "employment taxes" – to the IRS no later than the last day of the month following the end of the quarter.

8. On that same day, the defendant was also required to file, an Employer's Quarterly Federal Tax Return ("Form 941"), setting forth the total amount of income taxes withheld, the total amount of Social Security and Medicare taxes due, and the total tax deposits.

9. The defendant never remitted any employment taxes, including withheld trust fund taxes, nor submitted any Form 941 for any quarter of Tax Year 2019.

10. The defendant was a person responsible for collecting, accounting for, and paying over the employment taxes because she had the authority required to exercise significant control over WWOC's financial affairs. She, in fact, exercised that control by, among other acts, signing WWOC's checks and controlling its bank accounts; she was the sole individual with signature authority on its operating and payroll accounts. Further, the defendant assumed a significant day-to-day management role over all WWOC's operations after W.H.'s November 2019 arrest.

The Defendant's Role in WWOC Finances

11. To fund WWOC's startup and ongoing operations, the defendant and W.H. solicited investments from various individuals and promised returns exceeding 100% and, for some (including one investor P.G.), ownership interests. From in or about July 2017 through in or about August 2019, WWOC received over $1,400,000 from investors, which investments funded the vast majority of WWOC's expenses, as only approximately $161,000 in business income was ever deposited in WWOC accounts through on or about December 31, 2019. WWOC was unsuccessful in large measure due to W.H.'s mismanagement and refusal to listen to knowledgeable employees about oyster farming operations.

12. During the years under investigation, the defendant and W.H. made various representations about their roles in WWOC, with W.H. managing the daily operations and the defendant helping to manage the finances. The defendant was the sole signatory on WWOC's bank accounts and handled payroll for the company when it was first created, though she never maintained proper financial records for the company.

13. Despite the large investments they had received, WWOC did not engage professional accounting or bookkeeping services until approximately November 2019, instead making limited use of commercially available accounting software (QuickBooks) and delegating certain administrative and payroll functions to employees with either no or limited accounting or payroll experience, including their cleaning lady (P.D.), an employee who had been a personal trainer before being hired to work on the oyster farm (J.T.), and a friend of W.H.'s son who had just graduated from college with a finance degree (D.H.).

14. During her time overseeing WWOC's finances, the defendant transferred funds between personal accounts she controlled and WWOC's operational and payroll accounts, including transferring funds from her personal account into WWOC's operational account, and personal expenses were frequently charged to the business account and credit card. WWOC's account balances were frequently low or negative.

15. W.H. referred the defendant to a tax preparer, B.A., who prepared the defendant's personal tax returns for Tax Years 2015 through 2018, the only returns filed by the defendant, W.H., or WWOC for that period. On those returns, the defendant claimed losses and expenses related to oyster farming, including WWOC. B.A. terminated his relationship with the defendant in or about August 2019 after discovering she was holding herself out as married to W.H., despite having represented herself as single to him and on the tax returns he had prepared for her.

16. For Tax Years 2015 through 2019, the defendant also maintained paid employment outside WWOC, receiving between $150,000 and $300,000 a year in compensation from software companies like Microsoft. Starting in Tax Year 2016, these taxable earnings were offset not only by thousands of dollars claimed for unreimbursed business expenses but also by expenses and losses related to oyster farming operations in which she averred she had "materially

participate[d]." In Tax Years 2016 through 2018, she claimed those losses on an IRS Form 1040 Schedule F related to Profit or Loss from Farming, claiming a net farm loss of $115,697 for Tax Year 2016, of $166,135 for Tax Year 2017, and $170,964 in Tax Year 2018. She did not claim such losses when she filed her personal Tax Year 2019 return in or about October 2020.

17. For Tax Years 2017 and 2018, WWOC treated its workers as independent contractors and prepared the related Form 1099s, even though most of them should have been classified as employees. In or about January 2019, most WWOC workers were reclassified properly for Tax Year 2019, and WWOC began withholding trust fund taxes from their paychecks.

18. In or about October 2019, D.H. was hired by WWOC to review its accounts and attempt to rectify the bookkeeping; he discovered glaring irregularities. For instance, D.H. told the defendant repeatedly that she could not use WWOC accounts for personal expenses like going to the spa and that withholding payroll taxes from the employees' paychecks but not remitting them the IRS was illegal. The defendant responded that "[t]hey couldn't afford it and didn't want to do it that way," as to the latter. When the defendant told him she wanted to switch the employees back to independent contractors to avoid paying payroll taxes, he told her that doing so was likewise illegal, and she responded that she would take care of it. D.H. reported that he had been unsuccessful in getting back pay for significant amounts of unpaid work time and did not want to work with the defendant further, so he quit in or about January 2020.

19. Thereafter, E.B. arranged for the defendant to work with an accountant he knew professionally (K.M.) to reconcile the financial records and prepare tax forms. Against K.M.'s advice, the defendant insisted that WWOC employees be reclassified as independent contractors going forward, saying that the previous change to employee had been done by a "previous bookkeeper" without her knowledge. K.M. advised the defendant that, notwithstanding the

workers' designation going forward, the defendant still had to report the employment taxes withheld from the employees' paychecks on IRS Forms 941 and remit those amounts, together with the employer's contributions.

20. K.M. generated the appropriate W-2 and 1099 Forms for Tax Year 2019 and submitted them to the IRS. K.M. also generated the Tax Year 2019 quarterly Forms 941 and annual Form 940, the employer's Federal Unemployment Tax Act ("FUTA") return, but did not file them because the defendant said that she would do so.

21. The defendant told K.M. that she had not paid over the outstanding employment taxes to the IRS because she did not have the money to do so. The defendant also repeatedly made promises about how she would pay both K.M. and the outstanding taxes – by securing a PPP loan, by selling property, etc. – but failed to either pay K.M. or remit the outstanding employment taxes after achieving some of those goals.

22. K.M. became uncomfortable continuing to work with the defendant and stopped doing so in or about April 2020. K.M. sent a disengagement letter in or about June 2020 reminding the defendant of her obligation to file her tax returns.

23. At the same time the defendant was working with K.M., she was also working with a local bank loan officer (C.M.), with whom she had done business for more than a decade, to try to secure a PPP loan for WWOC. C.M. repeatedly asked the defendant for financial and employment records and information for WWOC for 2019 and 2020, including copies of certain tax filings and detailed information about the employment categorization of its workers.

24. The defendant responded to these requests in detail, with complex answers and an elaborate (but improper) rubric relating to the categorization of WWOC workers as either 1099 independent contractors or W-2 employees, despite her previous claims that such categorization

had been done without her knowledge. Likewise, when it became apparent that the PPP loan would not include expenses relating to 1099 independent contractors, the defendant promised that the January 2020 list of employee names she had sent C.M. were all W-2 employees, despite having overruled K.M. in insisting that they be treated as 1099 independent contractors. In fact, the defendant justified asking for a PPP loan amount more than five times C.M.'s initial estimated amount in part based upon the need to include payroll taxes.

25. The defendant forwarded C.M.'s April 13, 2020, email requesting the Tax Year 2019 Form 940 to K.M. minutes after receiving it, and K.M. responded promptly, reminding the defendant that the Form 940 K.M. had prepared was available in QuickBooks but had not been filed because the defendant said she was waiting on the loan. K.M. declined to assist further, citing her unpaid fee. Nevertheless, the defendant responded to C.M.'s email with a detailed response purporting to be from "the accountant."

26. In support of WWOC's PPP loan application, the defendant sent C.M. copies of what appeared to be a Tax Year 2019 Form 940 for WWOC signed by her the same day, April 13, 2020, and a Tax Year 2020 Q3 Form 941 for WWOC signed by her April 16, 2020, but ) in support of WWOC's PPP loan application but never actually submitted either form to the IRS.

27. The defendant was eventually approved for a PPP loan for WWOC and received a deposit of $76,000 from the Small Business Administration on or about April 27, 2020.

28. Despite her repeated promises, at no time did the defendant ever remit any of the outstanding employment taxes, though she continued to pay (net) payroll expenses and personal expenses, like Netflix and Ulta, from WWOC's operating account.

29. Incomplete bookkeeping records were produced by WWOC in response to a grand jury subpoena in January 2020, including an electronic general ledger that covered the period of



approximately April 1, 2019, through January 2020. The general ledger was not comprehensive of the business accounting transactions but did include entries for payroll and tax withholdings.

30. Using this ledger and the Tax Year 2019 W-2s K.M. actually submitted to the IRS, law enforcement was able to determine that, for Tax Year 2019 collectively, the defendant collected and failed to account for and remit a total of approximately $36,597 in trust fund taxes ($18,447 in federal income taxes and $18,150 in FICA taxes) for WWOC. As to the fourth quarter of Tax Year 2019 specifically, remittances and Form 941 due no later than January 31, 2020, the defendant collected and failed to account for and remit a total of approximately $9,419.39 in trust fund taxes ($4,800.82 in federal income taxes and $4,618.56 in FICA taxes) for WWOC.

31. According to the signed-but-not-filed Tax Year 2019 Form 940, the defendant also was required to pay a balance of $495.03 for WWOC's FUTA obligations.

32. For Tax Year 2019, the defendant was required to account for and pay over approximately $36,597 in withheld trust fund taxes, together with $18,150 in matching employer FICA contributions, and a $495.03 FUTA balance. Altogether, the defendant failed to remit approximately $55,242.03 for WWOC's Tax Year 2019 obligations.

33. During the first three quarters of Tax Year 2019, WWOC had sufficient funds to pay the withheld trust fund taxes on the dates they were due to be remitted, having a combined account balance of approximately $22,738.87 on or about April 30, 2019; $41,968.18 on or about July 31, 2019; and $34,048.44 on or about October 31, 2019.

34. WWOC's combined account balance, approximately $2,471.52, was insufficient to pay the Tax Year 2019 Q4 trust fund taxes when they were due on or about January 31, 2020, but the defendant nevertheless continued to pay thousands of dollars of both business and personal expenses from those accounts through at least July 2020. Moreover, more than $90,000 in non-

PPP funds were deposited into WWOC's operating account from January through July 2020, including more than $37,000 in customer payments alone.

35. As of June 22, 2022, the defendant has failed to submit the required Forms 940 and 941 for Tax Year 2019 and has not submitted any returns – personal or otherwise – for Tax Years 2020 and 2021, which have subsequently come due.

36. Therefore, for Tax Year 2019, in the Eastern District of Virginia and elsewhere, the defendant knowingly had the duty to account for and pay over the employment taxes she collected from her business's employees via paycheck deduction and willfully failed to so account and pay over the collected amounts to the IRS.

### The Defendant's Involvement in the India Venture

37. WWOC was largely kept in operation via a stream of cash infusions from investors, some of whom were offered an ownership interest in the company, even though its structure and the manner in which it was reported on the defendant's tax returns precluded such an arrangement. One of the primary investors was P.G., a personal friend of the defendant.

38. As WWOC's account balances began to run low in or about September 2019, the defendant approached P.G., largely through telephone calls and text messages, about investing in a new entity related to farming and harvesting oysters in India (the "India Venture"). P.G. was hesitant to invest, but the defendant reassured her with a more substantial and quicker return, guaranteed that her investment would be returned within twenty-four months if the India Venture failed, and noted that the funds did not need to be provided immediately but rather "just need to get there within a year or so." In doing so, the defendant reiterated her control and authority, saying "I own it LOL. It is my decision." Based in part on these representations, P.G. ultimately decided to invest $150,000 in the India Venture for the guarantee, return, and 5% ownership interest.

39. Despite her assurances, the defendant began asking P.G. to send large portions of the investment almost immediately. The defendant's pressure corresponded directly with the WWOC operating account balances being low and the defendant moving funds between various accounts, as P.G.'s transfers were almost the only source of income, with the only other business income deposits to the WWOC operating account totaling no more than a few thousand dollars. As a result of the defendant's entreaties, P.G. ended up wiring the full $150,000 in just the next three weeks from on or about September 17th through October 7th.

40. The defendant's solicitations of P.G.'s wire transfers included affirmative, material misrepresentations. For instance, when the defendant asked on or about October 4, 2019, for the balance of P.G.'s investment, the defendant said that they needed to show Indian officials that they had cash on hand to demonstrate that it was a viable business. When P.G. hesitated, the defendant specified that "We are at 178 and we need to show 250 to ensure we have the viability for the partnership" and that getting past the "financial checkpoint" was what would secure the grant of a processing plant [W.H.] negotiated with no upfront costs and a "a five year Government Contract," meaning that they had $178,000 in their account and needed to show $250,000 to secure a lucrative contract. At the time of that text, on or about October 4, 2019, there was no separate bank account for the India Venture, and WWOC's account balance was well under $178,000, opening at approximately $36,834.94 and closing at approximately $28,975.50. Further, the bulk of that balance was money remaining from P.G.'s last wire, with only approximately $1,059.89 of other deposits or credits being received since then.

41. After W.H.'s November 2019 arrest made the India Venture seem unlikely, premised as it had been on W.H.'s connections, P.G. asked about the return of her funds, given that she understood her money to be essentially held in escrow to show proof of funds while

waiting for the India Venture. The defendant did not return P.G.'s $150,000, and P.G. ended up pursuing its return civilly in *Gyetvay v. Hooper et al.*, 4:20-cv-78.

42. The parties reached a confidential settlement in that case, and the only amount that remains outstanding was entered as a Confession of Judgment in the Circuit Court of Mathews County, Virginia, in *Gyetvay v. Hooper*, CL22000104, on or about April 20, 2022. That judgment provides that the debtors (WWOC and the defendant) confess judgment in P.G.'s favor in the amount of $31,966.38, with 12% interest accruing from March 18, 2022, and with an additional $156.00 in court costs. The defendant agrees to pay any outstanding amounts of that judgment as part of her restitution in connection with her plea agreement in the instant matter.

### Conclusion

43. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

44. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason

<br>

Jessica D. Aber
United States Attorney

Date: ~~August~~ September 2, 2022   By: _____
Julie D. Podlesni
Assistant U.S. Attorney

<u>Defendant's Signature</u>: After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Robin Hooper, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 9/2/22

_____
Robin Hooper
Defendant

<u>Defense Counsel's Signature</u>: I am counsel for the defendant in this case. I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: 9/2/22

_____
Matthew Weinberg, Esq.
Counsel for the Defendant